IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOHN HALARIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:06-CV-1646-N |
| | § | |
| VIACOM, INC., *et al.*, | § | |
| | § | |
| Defendant. | § | |

## ORDER

This Order addresses Blockbuster Defendants[1] and Viacom Defendants'[2] (together, "Defendants") motions to dismiss [7 & 9]. On September 8, 2006, Plaintiff John Halaris, on his own behalf and on behalf of others similarly situated, filed this action pursuant to Employee Retirement Income Securities Act ("ERISA") section 502(a)(2) and 502(a)(3), 29 U.S.C. § 1132(a)(2) & (3). Defendants argue that Halaris's claims should be dismissed because the Court lacks jurisdiction to entertain claims for individualized monetary damages on behalf of a subset of individualized plan participants, and, alternatively, that Halaris fails

---

[1]John F. Antioco, Peter A. Bassi, Mary Bell, Robert A. Bowman, Jackie M. Clegg, Gary J. Fernandes, Linda Griego, Keith M. Holtz, Bruce Lewis, John L. Muething, Dan Satterthwaite, Larry Zine, Blockbuster Inc. ("Blockbuster"), the Blockbuster Retirement Committee ("BRC"), the Blockbuster Investment Committee ("BIC") (collectively, the "Blockbuster Defendants").

[2]Viacom Inc. ("Viacom"), the Viacom Investment Committee ("VIC"), the Viacom Retirement Committee ("VRC"), William A. Roskin, John R. Jacobs, Robert G. Freedline, Barbara Mickowski, Philippe P. Dauman, Sumner M. Redstone, Richard J. Bressler, Michael D. Fricklas, and Mel Karmazin (collectively, the "Viacom Defendants").

to state a claim upon which relief can be granted.  The Court denies the motions in part, grants them in part, and grants Halaris leave to replead.

## I. BACKGROUND

Halaris, a former employee of Blockbuster and participant in the Blockbuster Investment Plan (the "Plan"), represents a putative class of beneficiaries of the Plan at any time during the Class Period, i.e., between November 15, 2003 and the present, whose accounts included investments in Blockbuster.  On behalf of himself and the putative class, Halaris asserts various claims for breach of fiduciary duties imposed by ERISA.  At bottom, Halaris contends that neither he nor other participants have received all of the vested benefits to which they were entitled under the Plan as a result of the conduct of Defendants.

The Plan, a defined contribution 401(k) retirement plan, was sponsored by Blockbuster and maintained for the benefit of eligible full-time and part-time Blockbuster employees.  A retirement committee, composed of members appointed by Blockbuster's board of directors, administered the Plan.  An investment committee exercised discretionary authority over the Plan's assets and was authorized to select the specific investment funds to be included in the Plan.  Prior to July 29, 2004, Viacom's board of directors appointed the members of the investment committee; since July 29, 2004, Blockbuster's board of directors has appointed the members of the investment committee.  Both the retirement committee and investment committee were named fiduciaries of the Plan pursuant to its terms.

Employees accumulate assets in the Plan through two primary avenues.  First, the employee/participants could make contributions.  That is, participants could save for

ORDER – PAGE 2

retirement by directing the investment of certain deferred compensation – i.e., salary contributions, after-tax contributions, and rollover contributions – into the various funds established by the Investment Committee.  Second, Blockbuster made certain matching contributions.  According to the Plan, Blockbuster's matching contribution equals 100% of the first 3% of annual compensation contributed and 50% of the next 2% of annual compensation contributed.  Before January 1, 2006, matching contributions were initially invested in the Blockbuster Stock Fund, which participants could freely transfer into other investment funds available under the Plan.  Since January 1, 2006, participants direct the initial investment of the matching contributions, although, the Blockbuster Stock Fund remains an option.

The events giving rise to this dispute began on February 10, 2004, when Viacom announced that it would pursue the divestiture of its 82% interest in Blockbuster through a tax free split-off.  In its Exchange Offer Prospectus (the "Prospectus"), Viacom offered to accept up to 27,961,165 shares of Viacom Class A and Class B common stock in exchange for shares of Blockbuster.  A Viacom shareholder electing to participate in the offer would receive 5.15 shares of Blockbuster stock, consisting of 2.575 shares of Blockbuster Class A common stock and 2.575 shares of Blockbuster Class B common stock, for each Viacom shares (whether Class A or Class B) tendered.  By the terms of the offer, Viacom shareholders would receive a 17.6 to 19.2 % premium over then-current market prices of the

two stocks.[3]  Pursuant to the Exchange Offer, Plan participants traded approximately 2,130 shares of Viacom stock for almost 11,000 shares of Blockbuster stock.  By the end of 2004, Plan participants' accounts held approximately 1.1 million shares of Blockbuster common stock.

Shortly after the split-off was complete, Blockbuster began disseminating unfavorable financial information.  On October 27, 2004, Blockbuster issued a Fourth Quarter and Full Year 2004 Business Outlook in which it announced its expectation that profitability would be down for 4Q:04.  The release explained that continued weakness in the rental industry, the cost of various new business initiatives, and higher interest expense of the debt incurred to pay the special dividend would result in the significant decline in profitability.  Blockbuster further explained that it intended to invest heavily in the business in 2005, which, combined with lagging rental industry, would adversely affect profitability for 2005 as well.  Still, Blockbuster assured shareholders that it "believed" it was "taking the right steps to position Blockbuster for future growth in both revenues and profits."

On August 9, 2005, Blockbuster reported a net loss of $57.2 million, or $0.31 per share, for the second quarter of 2005 (the "August 9 Announcement").  Moreover, Blockbuster reported a 5.2% decline in total rental revenues and a decrease in gross profits, rental gross profits, and rental gross margins of 11.5%, 10.0%, and 600 basis points,

---

[3]On June 18, 2004, Blockbuster announced that it would pay a special cash dividend of $5.00 per share of common stock, payable September 3, 2004, to shareholders of record at the close of business on August 27, 2004.  Viacom received $738 million in proceeds as a result of the special dividend.

respectively, during 2Q:05.  Blockbuster attributed these declines to lower gross margins from its internet venture and the combination of decreasing revenues per transaction and increasing product purchases resulting from "No Late Fees" and subscription-based memberships.[4]  Furthermore, Blockbuster withdrew its full-year forecast and stated that it had negotiated with lenders to prevent a high debt ratio from triggering default on a line of credit.

Following the August 9 announcement, the price of Blockbuster Stock dropped.  On the day of the announcement Blockbuster Class A common stock fell $0.92, or 11%, from $8.01 to $7.09 per share, on a trading volume of 14,171,000.  Similarly, Blockbuster Class B common stock fell $0.99, or 13%, from $7.60 to $6.61.  The trend continued the following day, resulting in around a 16% loss of value for each Class over a two day period.  On November 11, 2005 certain of Blockbuster's shareholders filed suit alleging violations of sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq*., and sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq*., and Rule 10b-5 promulgated under the Exchange Act by the SEC.  *See Congregation of Ezra Sholom, et al., v. Blockbuster Inc., et al*., No. 05-CV-2213-N (N.D. Tex.).

---

[4]On December 14, 2004 Blockbuster unveiled a new "No Late Fee" initiative. Pursuant to this initiative, Blockbuster would stop charging costumers a fee for keeping in-store rentals past their due dates.  Instead, costumers were given a one-week grace period within which to return the movie, and after which Blockbuster would automatically sell the costumer the product, less the rental fee.  If the costumer returned the movie within thirty days, Blockbuster would credit the account with the amount, less a $1.25 restocking fee.

On March 9, 2006, Blockbuster announced that, due to an accounting misclassification, it would reclassify cash flows relating to the purchase of videos for its rental library contained in its financial statements dating back to 2003. Blockbuster had previously classified the purchases as an investing cash outflow and rental library assets as a noncurrent asset. However, as a result of discussions with the SEC, Blockbuster determined that rental library purchases should be classified as an operating cash outflow and that rental library assets should be classified as a current asset. On September 8, 2006, Halaris filed this action pursuant to Employee Retirement Income Securities Act ("ERISA") section 502(a)(2) and 502(a)(3), 29 U.S.C. § 1132(a)(2)-(3).

In his complaint, Halaris lists a bevy of allegations against Defendants. First, Halaris alleges that the investment committee member defendants breached their fiduciary duty of prudence by allowing Plan participants to hold and purchase Blockbuster stock and by allowing participants to exchange Viacom stock for Blockbuster stock. Halaris argues that Blockbuster was an imprudent investment because: (1) Blockbuster was beset with operational and financial difficulties that had yet to be publicly revealed, (2) Blockbuster stock was imprudently over-concentrated in participants' 401(k) portfolios, (3) Viacom was in the midst of dumping its 80% stake, virtually assuring a decline in Blockbuster's stock price, (4) Blockbuster's financial statements were materially overstated for much of the class period, (5) Blockbuster was planning to eliminate late fees and, thus, a source of profits, and (6) Viacom was using its control position to saddle Blockbuster with crippling debt that threatened the company with insolvency. Furthermore, Halaris argues that because some

investment committee members were also members of management, knowledge of internal corporate events may be easily inferred.

Halaris's remaining allegations center on various breaches of duty under ERISA. Count II alleges that Defendant members of the VRC and BRC breached their duty to provide complete and accurate information. Count III alleges that certain Viacom and Blockbuster Defendants breached their duty to monitor the fiduciaries they appointed. Count IV alleges that all Defendants breached their duty of loyalty to avoid conflicts of interest. Count V alleges that co-fiduciaries failed to prevent other fiduciaries' breaches. Finally, Count VI alleges that Viacom and Redstone engaged in self-dealing.

Defendants contend that Halaris lacks standing under sections 502(a)(2) and (3). Specifically, Defendants argue that Halaris's section 502(a)(2) claims must be dismissed because they are claims for individualized monetary relief on behalf of a subset of individual plan participants, rather than for the Plan itself. Defendants argue that Halaris's section 502(a)(3) claims must be dismissed because monetary relief cannot be recovered under the guise of equitable relief or restitution. Defendants also move to dismiss Halaris's claims under Rules 9(b) and 12(b)(6). For reasons explained below, the Court grants Defendants' motions in part.

## II. MOTION TO DISMISS STANDARD

Rule 12(b)(1) allows motion to dismiss for "lack of jurisdiction over the subject matter." FED. R. CIV. P. 12(b)(1). Whenever it appears by suggestion of the parties or

otherwise that a court lacks jurisdiction over an action's subject matter, the court must dismiss the action.  FED. R. CIV. P. 12(h)(3).

Rule 12(b)(6) allows a motion to dismiss for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  To survive a motion to dismiss, a complaint must include some factual allegations to support the elements of the asserted claim.  Lower courts have long cited *Conley v. Gibson*, 355 U.S. 41 (1957), in support of a very lenient understanding of the pleading requirements of Rule 8(a)(2).  The Supreme Court recently clarified the requirements of that rule:

> This case presents the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act.  Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.*; *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  Factual allegations must be enough to raise a right to relief above the speculative level, *see* 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216, pp. 235-236 (3d ed. 2004) (hereinafter WRIGHT & MILLER) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), *see, e.g., Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (footnote omitted). Although the context of this discussion in *Bell Atlantic* was the Sherman Act, nothing in the reasoning of the decision would appear to limit its scope to Sherman Act claims. Thus a plaintiff must plead sufficient facts, not legal conclusions, that if true would raise a right to relief above the speculative level.[5] If the complaint is lacking, dismissal is appropriate. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) ("[d]ismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief."); *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).

### III. STANDING UNDER SECTION 502(A)(2) & (3)

#### A.  A Section 502(a)(2) Claim Must Benefit the Plan as a Whole

Under ERISA section 502(a)(2), a plan participant may bring a civil action "for appropriate relief under section 1109 of this title . . . ." 29 U.S.C. § 1132(a)(2). That is, section 502(2) provides plan participants a cause of action against "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries," provided that such action "make[s] good *to such plan* any losses *to the plan* resulting from each such breach, and to restore *to such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . ." 29 U.S.C. § 1109(a) ("section 409") (emphasis added).

---

[5]The Supreme Court decided *Bell Atlantic* after the briefing of the motions to dismiss, so the parties have not had an opportunity to address whether it would change analysis of any of the arguments raised in the motions to dismiss.

In *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134 (1985), the Supreme Court explained section 502(a)(2)'s standing requirement. There, Russell, who had become disabled and received plan benefits until October 17, 1979, sued under section 502(a)(2) following the interruption of benefit payments.[6] *Id.* at 136-37. The district court granted summary judgment, holding that "ERISA bars any claims for extra-contractual damages and punitive damages arising out of the original denial of plaintiff's claims for benefits . . . ." *Id.* at 137. The Ninth Circuit panel affirmed in part and reversed in part. Significantly, the Ninth Circuit concluded that the violation gave rise to a cause of action under section 502(a)(2). *Id.* at 138. Reversing the Ninth Circuit, the Supreme Court explained "that recovery for a violation of § 409 inures to the *benefit of the plan as a whole*." *Id.* at 140 (emphasis added). The Court continued, "[a] fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect *the entire plan*, rather than with the rights of an individual beneficiary." *Id.* at 142 (emphasis added). Stated differently, section 502(a)(2) bars *individualized* claims for monetary relief.

The Fifth Circuit reiterated section 502(a)(2)'s standing requirement in *Matassarin v. Lynch*, 174 F.3d 549 (5th Cir. 1999). The Fifth Circuit explained that claims brought pursuant to section 502(a)(2) must "inure to the benefit of the plan as a whole and not to the benefit only of individual plan beneficiaries." *Id.* at 566. Because "[m]ost of the ERISA

---

[6]The plaintiff's eligibility was restored on March 11, 1980, and the plan paid retroactive benefits in full. *Russell*, 473 U.S. at 136.

breaches that Matassarin allege[d] concern[ed] only her individual account or, at most, those of the sixty-seven Plan participants," the Court concluded that Matassarin "failed to allege any way in which the defendants' actions caused a loss to the Plan as a whole as envisioned in § 502(a)(2)." *Id.* Consistent with *Russell*, the Fifth Circuit held that section 502(a)(2) is the improper vehicle through which to address an alleged harm affecting less than all of the plan participants.

Relying on *Russell* and *Matassarin*, Defendants contend that Halaris lacks standing to sue because he represents only a subset of plan participants who seek recovery for individualized monetary relief. In his complaint, Halaris states that "[t]his action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2) . . . ." Complaint ¶ 9; *see also* Complaint ¶ 10. Defendants argue that Halaris's statement is a function of pleading and form only. That is, Defendants argue that the "real nature of the relief sought" is monetary remuneration for those individuals who actually suffered, rather than recovery for the Plan itself. Viacom Motion at 6-7 (citing *Gerosa v. Savasta & Co.*, 329 F.3d 317, 321 (2d Cir. 2003)). According to Defendants, the Plan's only role is to collect the damages and pass them through to a subset of participants; individuals who elected to transfer their contribution from the Blockbuster Stock Fund would not share in the recovery.

ORDER – PAGE 11

Recent Fifth Circuit precedent simplifies the Court's analysis of this issue. *Langbecker v. Electronic Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007).[7] The underlying facts in *Langbecker* are very similar to those alleged here. Electronic Data Systems Corporation ("EDS") provided a 401(k) defined contribution plan for the benefit of its employees. The plan allowed employees to direct their accounts into several investment options, including an EDS stock fund. EDS also provided a matching contribution which

---

[7]Before *Langbecker*, the state of the law in the Fifth Circuit was somewhat muddled. In *Milofsky v. American Airlines, Inc.*, 404 F.3d 338 (5th Cir. 2005) ("*Milofsky I*"), *vacated*, 442 F.3d 311 (5th Cir. 2006) (*en banc, per curium*), the Fifth Circuit rejected "the argument that the claim inures to the benefit of the pan as a whole just because the complaint requests that damages be paid to the plan instead of directly to the respective plaintiffs." *Id.* at 343. Much like Halaris here, the *Milofsky I* plaintiffs sought payment to the Plan as an entity, but "specifically requested that the damages be allocated among plaintiffs' *individual* accounts proportionate to *plaintiffs' losses*." *Id.* (internal quotations and citation omitted) (emphasis in original). Over the partial dissent of then-Chief Judge King, the *Milofsky I* majority explained that simply because the plan as an entity would technically hold the funds, the funds would nonetheless be channeled exclusively into the accounts of only a subset of the plan, meaning that relief could not benefit the plan as a whole as required by section 502(a)(2). *Id.* at 344. Even if the "total assets of the plan – defined as the sum of the values of the individual accounts – would increase as a result of a successful suit" recovery would still not "inure[] to the benefit of the entire plan." *Id.* The Court explained that "adopting that logic would dramatically expand standing under § 502(a)(2) to circumstances in which only a single plaintiff alleges that his account was damaged as a result of a breach of fiduciary duty that was uniquely targeted at him and no other plan participants." *Id.* The Court was not willing to "adopt an interpretation that would allow a plaintiff, merely by praying that relief pass through the plan into individual accounts, to eviscerate the standing requirement imposed by § 502(a)(2) by engaging in a legal fiction that the suit benefits the plan as whole." *Id.* The Court therefore affirmed the district court's dismissal for lack of standing under section 502(a)(2). Shortly after issuing its opinion, the Fifth Circuit took *Milofsky I en banc* and vacated its earlier ruling with a *per curium* opinion. *See Milofsky v. American Airlines, Inc.*, 442 F.3d 311 (5th Cir. 2006) (*en banc, per curium*). The *en banc* court concluded that, "[m]easured by the principles of notice pleading and the standards controlling dismissal under FED. R. CIV. P. 12(b)(6), the district court erred in dismissing these claims." *Id.* at 313. However, the Court neither rejected the *Milofsky I* majority's reasoning nor adopted the reasoning in Chief Judge King's dissent.

ORDER – PAGE 12

was made in the EDS stock fund, and which could not be moved into a different fund for two years. EDS published an earnings warning, which resulted in a substantial stock price drop. Langbecker and other employees with EDS stock in their retirement accounts then brought a putative class action against various plan fiduciaries under ERISA. The district court certified the case as a class action and defendants took an interlocutory appeal.

The first issue addressed by the Court was the defendants-appellants' argument that no plan-wide relief was available under section 502(a)(2) based on losses to individual participants' accounts. The Circuit rejected that argument:

> To the extent Appellants' contention is that no plan-wide fiduciary duties exist with respect to 401(k) participant-directed plans, it is clearly overbroad. ERISA does not distinguish fiduciary duties according to the type of employee investment or pension plans at issue. The Supreme Court described Congress's concern about "the possible misuse of plan assets, and with remedies that would protect the entire plan," also without limitation concerning the type of plan. *Russell*, 473 U.S. at 142, 105 S. Ct. at 3090. Certain fiduciary duty breaches can injure 401(k) participants generally and indiscriminately: theft from the plan; mapping; noncompliance with ERISA-mandated duties to inform; engaging in transactions that involve conflicts of interest; and setting unreasonable blackouts are among the possibilities. Allegations that ERISA fiduciaries promoted company stock to prop up its value or misled participants could also state plan-wide breaches of fiduciary duties.
>
> In this case, however, the description and indeed existence of a Plan-wide fiduciary breach are elusive at this preliminary stage of the case. The key contention is that the fiduciaries "knew" EDS stock was too risky to be offered or allowed as an investment by any Participant (or the vast bulk of them) in the 401(k) Plan during the period in question. This contention challenges the fiduciaries' judgment that EDS was or remained a prudent investment for the Plan to offer. Hindsight is easy in a case like that of Worldcom, a company so infected by over-extension and fraud that it collapsed, and its stock became worthless. EDS, despite its alleged failings, is not in that category. From the facts adduced at the class determination

ORDER – PAGE 13

stage, it is far from clear that EDS stock became too risky to be a permissible 401(k) offering or the basis for the employer-matching contribution. Thousands of Plan Participants continued to purchase EDS stock regularly after the company's adverse disclosures and after the price dropped. Thousands held on to their EDS stock rather than sell. The stock price has slowly but steadily rebounded. Given these facts, plus the long-term horizon of retirement investing and the favored status Congress has granted to employee stock investments in their own companies, ascribing a Plan-wide fiduciary failure to Appellants seems fraught with uncertainty. Nevertheless, at this preliminary stage, we cannot rule out Appellees' theories as a matter of law. Correlatively, the possibility of a suit on behalf of the Plan as a whole is not eliminated simply by the fact that any recovery would have to be allocated among individual Participants' 401(k) accounts.

*Langbecker* 476 F.3d at 307-09 (footnotes omitted). *Langbecker* is controlling on this point. The Court therefore denies Defendants' motion to dismiss for lack of standing under section 502(a)(2).

### B. Section 502(a)(3) Claim

Under ERISA section 502(a)(3), a Plan participant may bring a claim "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . ." 29 U.S.C. § 1132(a)(3). Unlike section 502(a)(2), section 502(a)(3) does not refer to section 409 and is therefore not limited to claims for remedies that would protect "the entire plan." However, also unlike section 502(a)(2), parties may only bring section 502(a)(3) claims for traditional equitable relief. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) (holding that the term "equitable relief" in section 502(a)(3) must refer to "those categories of relief that were typically available in equity . . . .").

ORDER – PAGE 14

At issue here is Halaris's claim for restitution, which Defendants contend is merely one for monetary relief under the guise of equitable relief.  In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court explained that "'restitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case' and whether it is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought."  *Id.* at 213 (quoting *Reich v. Continental Casualty Co.*, 33 F.3d 754, 756 (7th 1994) (Posner, J.)).  A plaintiff has a right to restitution *at law* in cases in which the plaintiff "could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him."  *Id.* (citations and quotations omitted).[8]  Alternatively, a claim for restitution in equity lies when "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  *Id.*  "Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  *Id.* at 214.

*Langbecker* also controls on this point.  The Court of Appeals disposed of the plaintiffs' section 502(a)(3) arguments in a footnote:

---

[8] "In such cases the plaintiff's claim was considered legal because he sought to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money." *Great-West*, 534 U.S. at 213 (internal citation and quotations omitted).

> We note that Participants would not be eligible to pursue relief under §
> 502(a)(3) for "other equitable relief" under *Great-West* because the damages
> they seek do not restore to them specific funds that were inequitably kept in
> the Defendants' possession. At best, their action would seem to be one for
> legal restitution, which is not cognizable under § 502(a)(3). *See Great-West*,
> 534 U.S. at 214, 122 S. Ct. at 714-15.

*Langbecker*, 476 F.3d at 309 n.20.

Here, Halaris fails to identify any property currently in the possession of defendants for which he claims good faith ownership. In his reply, Halaris contends (1) that Defendants took "Plan Participants' Viacom stock and replac[ed] it with Blockbuster stock," and (2) that Defendants took "cash from Blockbuster in the form of a dividend." Pl. Response at 20. First, the Viacom stock does not belong in good conscience to Halaris. Viacom offered to exchange its stock at a 17.6 to 19.2 % premium and certain Plan participants accepted the offer; Defendants did not take any Plan participants' stock. Next, Viacom did not take any funds or property from the Plan when it accepted its portion of Blockbuster's special dividend; the cash reserves were an asset of the corporation itself. Moreover, qualified Plan participant accounts received their full share of the dividend. Because Halaris fails to identify any additional property in Defendants' possession to which he claims good faith ownership, "[a]t best, [his] action would seem to be one for legal restitution, which is not cognizable under § 502(a)(3)." *Id.* Accordingly, the Court dismisses Halaris's section 502(a)(3) claims.

## IV. PLEADING FRAUD WITH PARTICULARITY

Before addressing the merits of Defendants' motion to dismiss, the Court must first consider what standard applies. Defendants argue first that Halaris's complaint must meet the more exacting requirements of Rule 9(b). The most recent discussion of this question by the Fifth Circuit is in *Lone Star Ladies Inv. Club. v. Schlotzsky's Inc.*, 238 F.3d 363 (5th Cir. 2001). The complaint at issue included both fraud claims under the 1934 Securities and Exchange Act[9] and strict liability claims under the 1933 Securities Act.[10] The district court, citing *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994), held that Rule 9(b) applied to the Securities Act claims because they were "grounded in fraud," *id.*, and dismissed the complaint. The district court then denied leave to plaintiffs to file an amended complaint that asserted only Securities Act claims.

The Fifth Circuit observed that "Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not." 228 F. 3d at 368. The Court noted "[t]he price of impermissible generality is that the averments will be disregarded." *Id.* (footnote omitted).

> Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated. The proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated. There is a qualification. A district court need not rewrite such a deficient complaint. It may dismiss, without prejudice, placing that responsibility upon counsel.

---

[9]15 U.S.C. § 78j.

[10]15 U.S.C. §§ 77k & 77*l*.

*Id.* The Court then held that the district court erred in rejecting the proposed amended complaint:

> The proposed amended complaint left no room for misunderstanding. It expressly "do[es] not assert that defendants are liable for fraudulent or intentional conduct and disavow[s] and disclaim[s] any allegation of fraud." It avers that Schlotzsky's made untrue statements of material facts and omitted to state material facts, in violation of 15 U.S.C. § 77k. Those claims do not "sound in fraud" and cannot be dismissed for failure to satisfy Rule 9(b).

*Id.* at 369 (alterations in original).[11] The line between a pleading sounding in fraud and one that does not thus appears to be whether the pleading includes allegations of intentional or knowing misrepresentations or omissions.[12]

Once Rule 9(b) is implicated, the heightened pleading rules are well known. A plaintiff must allege "the specific time, place, and contents of the false representation, along with the identity of the person making the representation and what the person obtained thereby." *Melder*, 27 F.3d at 1100.

The Court finds that Count II of the complaint sounds in fraud. In particular, the Court finds that allegations of knowing omissions sound in fraud. The Complaint repeatedly alleges that the various defendants had knowledge regarding Blockbuster that was not known

---

[11]The Court "d[id] not reach the question of whether the original 1934 Act claims were pleaded with the specificity required . . . ." *Id.* at 367.

[12]This is consistent with the purpose of Rule 9(b). "[I]t has been said by innumerable federal courts that the requirement in Rule 9(b) is necessary to safeguard potential defendants from lightly made claims charging the commission of acts that involve some degree of moral turpitude." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1296, at 31 (3d ed. 2004). This reputational interest is implicated once an allegation of misrepresentation crosses the line from negligent or careless to intentional or knowing.

to Plan participants. *See, e.g.*, Complaint ¶¶ 4, 5, 49. This knowing allegation was repeated in the body of Count II. *See id.* ¶ 156. Count II generally alleges that the "Communication Defendants" misled plan participants by "conveying through . . . omission inaccurate information regarding the soundness of Blockbuster stock, and the prudence of investing retirement contributions in the stock." *Id.* ¶ 154. Thus, with regard to omissions, Count II alleges the knowing deception that is the hallmark of fraud.[13] Count II however is devoid of any of the particularity regarding the alleged omissions that Rule 9(b) would require. While the concept of pleading an omission with particularity is somewhat elusive, and there do not seem to be specific guidelines in the Fifth Circuit, *see In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 891-95 (N.D. Tex. 2005) (discussing particularity requirement as applied to omissions), Count II of the Complaint here is essentially devoid of any details that would satisfy Rule 9(b) with respect to the alleged omissions. Accordingly, the Court grants defendants' motion to dismiss with regard to Count II as it relates to omissions. The Court finds that the balance of the complaint does not allege the intentional or knowing deception required to sound in fraud.[14]

---

[13]Count II also alleges breach of fiduciary duties through similar misrepresentations. It does not allege, however, that the misrepresentations were knowing or intentional. Those allegations thus do not sound in fraud. *See Lone State Ladies*, 238 F.3d at 369 (holding that claims of misrepresentation absent allegations of intent or fraud do not implicate Rule 9(b)).

[14]Although Count I does include several allegations of knowledge, *see* Complaint ¶¶ 133, 140, it does not allege any deceit in connection with that, but rather breach of fiduciary duty by permitting ongoing investment by plan participants in Blockbuster stock.

ORDER – PAGE 19

### V. DISMISSAL OF COUNT I IS NOT APPROPRIATE UNDER *MOENCH*

Defendants argue that the Court should dismiss Count I (alleging breach of fiduciary duty by permitting Blockbuster stock as an investment option) due to Halaris's failure to plead facts to overcome the *Moench* presumption.  *See Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995).  In the course of reversing a grant of summary judgment, *Moench* held that "keeping in mind the purpose behind ERISA and the nature of ESOPs themselves, . . . an ESOP fiduciary who invest the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision." *Id.* at 571.  Defendants argue that to overcome the *Moench* presumption, a plaintiff must allege a precipitous drop in the sponsor's stock price and that a fiduciary knew of the impending collapse of the business.

Although the Fifth Circuit has not expressly followed *Moench*, it has commented favorably on it:

> The Third Circuit wisely balanced the competing policies of ERISA fiduciary duties with statutory exemptions to those duties crafted by Congress to encourage employees' investments in their companies' stocks. *See Moench v. Robertson*, 62 F.3d 553, 568-73 (3d Cir.1995).  The *Moench* standard was adopted by the Sixth Circuit, *see Kuper v. Iovenko*, 66 F.3d 1447, 1458-59 (6th Cir. 1995), and favorably commented on by the Ninth Circuit, *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097-98 (9th Cir. 2004).

*Langbecker*, *supra*, 476 F.3d at 308 n.19.  The Court will follow *Moench* in view of this endorsement by the Circuit.  The Court also holds that *Moench* applies to the plan at issue here, even though it is not a pure employee stock ownership plan.  *See, e.g.*, *Wright v. Or. Met. Corp.*, 222 F. Supp. 2d 1224, 1233 (D. Or. 2002), *aff'd*, 360 F.3d 1090 (9th Cir. 2004); *Landgraff v. Columbia/HCA Healthcare Corp.*, 2000 WL 33726564, at *6 (M.D. Tenn.

ORDER – PAGE 20

2000), *aff'd*, 30 Fed. Appx. 366 (6th Cir. 2002). The Court nonetheless denies the motion to dismiss on *Moench* grounds for two reasons.

First, Defendants misstate the applicable standard from *Moench*. Defendants' proposed "precipitous decline + impending collapse" is not the actual standard set in *Moench* for rebutting the presumption of reasonableness, but rather the specific factual allegations in *Moench* that the court of appeals held met its standard for rebutting the presumption. *Compare Moench*, 62 F.3d at 571-72 (establishing standard that presumption can be rebutted by showing of changed circumstances that establish "ERISA fiduciary could not have believed reasonably that continued adherence to ESOP's direction was in keeping with how a prudent trustee would operate," and noting in event of conflict of interest, fiduciaries must impartially investigate all investment options and obtain impartial guidance of disinterested outside advisor) *with id.* at 572 ("When all is said and done, this is precisely the argument Moench makes in this case: that the precipitous decline in the price of [sponsor] stock, as well as the [fiduciaries'] knowledge of its impending collapse" satisfied the standard). Second, the Fifth Circuit in *Langbecker* appears to preclude dismissal pursuant to the *Moench* presumption based on the face of the pleadings. Although the Court found the plaintiff's claims "fraught with uncertainty," 476 F.3d at 308, it held that "at this preliminary stage, we cannot rule out [plaintiffs'] theories as a matter of law." *Id.* Accordingly, the

Court denies the motions to dismiss Count I for failure to plead facts rebutting the *Moench* presumption.[15]

### VI. THE COURT DENIES THE BALANCE OF THE MOTIONS WITHOUT PREJUDICE

Defendants also assert various arguments regarding the balance of the Counts in the Complaint. One argument raised against all the remaining counts is that they are derivative of Counts I and II; because those counts should be dismissed (Defendants optimistically argue), the remaining counts should also be dismissed. As the Court has not dismissed those predicate counts, this argument fails.

Defendants also make some additional arguments regarding their Rule 12(b)(6) motion with regard to the remaining counts. However, Halaris has moved for leave to amend if the Court grants any part of the motions to dismiss; the Court grants the motion to amend in view of its partial grant of the motions to dismiss Count II of the Complaint. Because the Court is granting leave to replead and the parties have had no chance yet to address *Bell Atlantic*, it seems prudent to let Halaris in the first instance have a chance to amend in view of *Bell Atlantic* and then permit Defendants to address *Bell Atlantic* specifically in response to the existing Complaint or any amendments Halaris may make in response to *Bell Atlantic*. The Court therefore denies the balance of the motions to dismiss without prejudice.

---

[15]The Court does not preclude (or endorse) the idea that *Moench* could perhaps be addressed in an early motion for summary judgment applying the correct standard, nor does the Court consider whether this procedural aspect of *Langbecker* – the court cannot address *Moench* on the face of the pleadings – survives *Bell Atlantic*, which came out after *Langbecker*, as the parties have not briefed that question.

## CONCLUSION

The Court grants the motions to dismiss with respect to that portion of Count II dealing with omissions.  The Court grants Halaris leave to file an amended complaint in response to this ruling and, if desired, in response to *Bell Atlantic* within forty-five (45) days of the date of this Order.


Signed September 21, 2007.

David C. Godbey
United States District Judge